arguments not to exceed 15 minutes per side. Ms. Garner, for the appellant, you may proceed. Good morning, Your Honors. My name is Linda K. Garner, practicing for the Western District of Tennessee. In this case, Your Honors, this matter came before the District Court on the defendant's motion for summary judgment. The District Court ruled, after reading the briefs of the party, that the plaintiff had failed to establish his prima facie case for discrimination, hanging its hat particularly on the fact that the plaintiff was unable to find a comparator on all points of his allegation of discrimination. Your Honor, the plaintiff put forth substantial and unrefuted evidence that his job was twice that of other press operators. Could you speak up just a little louder, please, Ms. Garner? The plaintiff put forth substantial evidence that his job was twice that of other press operators. It would be the equivalent, Your Honor, of when I arrived in this court this morning. I was told that I had 15 minutes to give this court my argument. As well, I heard the opponent being told the same thing. They had 15 minutes. Well, in Mr. Ortiz's case, that 15 minutes for him was 7 1⁄2. And in that 7 1⁄2 minutes, Mr. Ortiz was expected to perform the same duties, the same argument, the same standard as his opponent, so to speak. He would have had to make sure that this court understood everything that the 15-minute opponent had. And that was Mr. Ortiz's situation, day in and day out. He was required to do two jobs, yet he had to report anything that went wrong in the course of his employment. He had to do a medal check for two of the jobs, one for the press operator, the press lines that he was running, and the other for the add-on machine. He had to report any error. What was the add-on machine? The add-on machine was an icebreaker machine. And there was nothing that differed from the add-on machine than from the regular presses that he ran. Everything was the same. It was doubled. The defendant could not point to one thing that differed that made this job one that's contemplated by the case law. For instance, Cox's, that says that a minor difference or a minor inconvenience, it doesn't count. Because two things may not be identical, but when it's magnified to the extent that it becomes a separate and independent job, that's different, I would submit, to this court. Well, was Mr. Ortiz, could he have bid for a job on another shift that's been raised here? No, Your Honor. I don't think that he could have. When he complained about the degree of his duties and the time frame within which he had to operate. Were there other shifts at this factory? There was a first, second, and third shift. Okay. And on the other shift that had the add-on, it was operated by Mr. Ortiz's son. And so I don't think that it was a meaningful opportunity that he was ever provided. He did talk about, he complained about having to do. But he didn't ever really put in a bid or ask to be assigned to some other shift, did he? No. When he complained, he was simply told by his supervisor that if you can't do it, we will find someone else to do the job. And I would submit, Your Honor, if I had been given seven and a half minutes to give this court my argument this morning, while my opponent had been given 15, I would not. You have all your time. Don't worry. Thank you. And the impact of discrimination, and this is not my saying, but it's greater when it's sanctioned by law. Well, let me ask you this question. I mean, if Hershey gave Mr. Ortiz double the work to do in the same amount of time, just standing alone, that itself would not be a Title VII violation. It might be unreasonable, unfair, unjust, whatever, but it's not a Title VII violation. You have to show that they did that because he's Hispanic. And so you have to show that there's a difference between how Hispanics were treated and non-Hispanics were treated. And isn't it true in this record that there was another Hispanic worker who didn't get this treatment, who had just the usual, let's call it single responsibility, rather than a double responsibility? There was a female Hispanic worker, Angela Salas, who testified that while she did not have this additional add-on, her workload was greater than the Caucasian male who also acted and worked in the capacity of a press operator. I would submit, Your Honor, that the only testimony that came from Mr. Ortiz with respect to his son, who did perform, who was also Hispanic American, he did perform the add-on just as Mr. Ortiz did. There was also testimony that the one person who was the relief person, who did the exact same thing as press operators, when he would perform in Mr. Ortiz's capacity, he testified that he would simply turn off the machine, which is why that testimony was relevant in Mr. Ortiz's affidavit that when he would turn off his machine, that the supervisor would observe him turning it off and said nothing. And his testimony was essentially, well, no one could do that. It was a two-man job. And that's what Mr. Ortiz was doing. So I submit that there were no other people who were doing this two-man job other than Hispanic Americans. And I think from that, the court could afford the inference. This was a summary judgment. The inference should be in the light most favorable to the non-moving party. That was not afforded in this instance. No one would question that if I were given seven and a half minutes before this honorable court, that that would be inherently unfair. If it were myself, an African-American female, and my opponent was a Caucasian male, I think because there are no other things that the court could look at, the conclusion that this court would have to reach is that it was based on an impermissible purpose. You admit, except for the increased workload, that Hershey could have fired your client because he messed up on this wand and also on the plastic and the candy, so to speak? That's correct. Your Honor, but for the discrimination inherent in the terms and condition of Mr. Ortiz's employment, these mistakes would likely not have happened. And that's what makes the situation so egregious. He was given two jobs, yet he had to do the check every 30 minutes for each job. And one of the incidents that the defendant complained about was Mr. Ortiz's failure to report a wand that had been lodged in the machine. Mr. Ortiz testified that when the wand was misplaced, his machine atop his regular job was overflowing, and someone said, you've got to get that. He went to take care of that, and on the way back, he was met with a supervisor who said, we found your wand. Mr. Ortiz was placed in a position where there was no way he could perform his job adequately because he had been given a discriminatory assignment, not a minor inconvenience where it's just a little harder work. This was a job, a second job. And, Your Honor, it was all of the indicia of discrimination cloaks it. It's there. Well, the problem that has also arisen is that Hershey claims that your client got written up and had a last chance citation, and they actually were permissive on two or three times when they could have fired him, and they didn't. Your Honor, the last chance agreement was given in 2008, and plaintiff offered that to show the court the discriminatory animus of the defendant. In that situation, Mr. Ortiz had gone over to check the quality control. That's not the right word. He had gone over to check the quality control in packaging, and the Caucasian employee who was a mechanic, Claude Taylor, was present in the area. He came through, and Mr. Ortiz testified that he elbowed me, and it wasn't an accident. Conversely, the human resource gave an affidavit saying, Mr. Ortiz testified that he did say the next time you'll get an elbow in the face. And so the district court had the opportunity to look at the testimony, but what the district court did and what the plaintiff submits was error is that he looked at the human resource affidavit, he looked at plaintiff's affidavit, and the human resource said plaintiff did, the plaintiff said he didn't, and then the light that's supposed to be most favorable to the move-in was afforded to the move-in rather than the non-move-in, Your Honor. That's error. Okay. We'll leave it there because you're going to have some rebuttal time, and we'll hear from Mr. Martin. Yes. Thank you very much. Thank you, Ms. Korner. Good morning, Your Honors. May it please the Court, my name is John Martin. I represent the defendant and the appellee in this matter, the Hershey Company. This is an employment discrimination case, and the issue is whether the appellant, Mr. Ortiz, is able to demonstrate that his termination was the product of informational race discrimination. The lower court properly construed the evidence thoroughly through looking through everything in the case and determined that Mr. Ortiz had failed to adduce any evidence to prove that his termination or any employment-related decision was based on or related to his race. On appeal, it appears as though, as below with the lower court, they looked at three different discrete acts of discrimination, and the lower court identified it as the inequitable assignment of job duties, the termination itself, as well as the last chance agreement. In the appellate brief, the plaintiff concedes that the last chance agreement is not a material adverse employment action. That issue gets put to the side in terms of a discrete discriminatory act. The plaintiff acknowledges that there were quality control violations that led to the termination, creating that legitimate nondiscriminatory reason through which there's no pretext. It appears as though we're talking solely about the inequitable assignment of the job duties or what the plaintiff refers to as the doubled workload. What happens is that there is an A line, there is a B line, and there is a D line at the breath savers production area of the plant. Angie Salas, who is Hispanic, works on the A line. Wes Garlock, who is Caucasian, works on the B line, and the plaintiff, Jesse Ortiz, works on the D line. Sometime in or around 2007, an add-on was added to the D line, which fed two additional lines of icebreakers mints, not the breath savers mints, but just two additional lines of icebreakers that would feed through to the packaging department. There's no evidence in the record to show that that decision to place an add-on to the D line had anything to do with any type of discriminatory animus one way or another. In fact, if we look at it through the prima facie case rubric and we're looking at, okay, let's talk about the inequitable assignment of job duties, such as it is, and the D line has that add-on for the icebreakers, it fails on the prima facie case because we're looking at whether or not there was a material adverse change to the employment terms and conditions. And the COSIC case that the plaintiff cites refers to several factors as to what can constitute a material adverse employment action, and the factors listed are a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits. Notably, the next factor is significantly diminished material responsibilities or other indices that might... Let's say they had told him starting tomorrow you've got the D and the B lines, and he says, there's no way I can do that. I can't physically cover both of them. And they say, well, you know, so what? Go ahead and do it. That would be kind of adverse to him, wouldn't it? I think that would be a pure doubling of the duties and responsibilities. So it's not, I mean, but I'm suggesting it's not as clear cut in terms of determining whether it's an adverse action, as that recitation might suggest. Correct. In the COSIC case, however, the nurse alleged that her shift in employment that she was placed on placed her in a more physically demanding position. She was a supervisory nurse that was moved to more of a residential nursing type position, and it was more physically demanding. Here we have a situation where the plaintiff is alleging that his position is more physically demanding. I wouldn't say this is what their, the gist of their argument is not he's having to lift heavier weight. It's that, look, he can't do it all, and what does he get fired for? Quality control. And that's not a coincidence. So, I mean, I would just suggest to you that's not a hugely persuasive point. I mean, what about the argument that Ms. Garner makes that there was evidence that has to be looked at favorably in summary judgment that some of the Hispanic employees in the plant were getting more to do in less time than some of the white employees? To that point, I would focus first and foremost on the first shift, where we have Angie Silas, Hispanic American, West Scarlock, Caucasian, the plaintiff, Jesse Ortiz, Hispanic American. In that situation, Angie Silas does not have the add-on to the A line. She's receiving more favorable treatment than Jesse Ortiz himself, who is also Hispanic American. To the extent that they would like to point to the second shift, where Mr. Ortiz's son was also working the D line with the add-on, there is no evidence in the record to show that there were any quality control violations committed by him or that any discipline was issued to Mr. Ortiz's son. To that end, you can compare the two to say there was discipline issued to Mr. Ortiz but not to Mr. Ortiz's son, even though they were doing the same work. Did they both have double-up work or something of that nature? To the record, yes. They both worked on the D line, and there was an add-on that brought the icebreaker's mince through that on the D line as opposed to the A or B lines. There was an African American individual who was working the D line during the third shift. To take it to a point where— Just one Hispanic employee. On the D line, correct. There wasn't just Hispanic employees who were working on the D line. The record shows that there was an African American individual working the D line on the third shift as well. Again, so moving away from the issue as to whether or not there's a material adversity for the prima facie case, the issue also becomes whether or not similarly situated individuals were treated more or less favorably. And here we have an Hispanic American individual working on the A line who was treated more favorably. In fact, if we think about where and how that add-on would be placed, if they placed it on the A line, then the Hispanic American female employee could allege that that was sex discrimination because there were two other male employees working on there. If it was placed on the B line, the Caucasian employee could claim that that was race discrimination because Caucasian employees made up 6 percent or so of the workforce at the Hershey plant. There really was nowhere to place that, so somebody couldn't have alleged that that decision was made on the basis of race or some type of protected characteristic. But it was recognized by Hershey that it was additional work. Yes. Yes, Your Honor. Phyllis Granberry, who was the supervisor during her deposition, said, yes, Mr. Ortiz was responsible for a little bit more than the other press operators under her purview on the first shift. That is correct. But her position is she cut him slack in interpretation, and still he persisted with violations. I think the evidence of record clearly shows that there was leniency afforded to Mr. Ortiz over the course of his employment. There were no fewer than six quality control violations before his termination came to bear. There was a last chance agreement that he was placed on in January of 2008, at which point any quality control violation or any type of policy violation occurring after that time could have resulted in his immediate dismissal or termination, and it did not. How long was Mr. Ortiz an employee of Hershey? He was employed in October of 2001. In Memphis, but he came from another plant. He came from another plant, but he wasn't a Hershey employee until October of 2001. All right. No pun intended. No pun intended. As was raised previously, again, Mr. Ortiz had every opportunity to bid into another shift, to bid into another line. He chose not to. Hershey never denied him the opportunity to do so. That is an undisputed fact of record as well. Did he get paid more for doing more work? I don't believe that's evidence of record. I think the allegation from the plaintiff in his complaint was he was doing the job of two for the same pay. That is his contention. There were two additional lines that were run. There was also a declaration from Jerry Love, who was the first shift plant manager, talking about, and I believe that is record evidence. I can find it here. It is 50-5. And in his declaration, he talks about the rates per minute at which these mints flow through. The dedicated icebreaker presses the dedicated icebreaker lines are moving at a much, much, much more rapid clip than the add-on line that was added to the Breathsavers D line. It was a slower line than the other Breathsavers plants. To the extent that Mr. Ortiz asked for help, there is evidence in the record to show that he was provided that help. When he made it known that there was assistance that was requested, assistance was provided to him. And another issue to address, essentially, is that if we're looking at this, as we should, as a discrete act, putting aside to one second and presupposing that there was a discriminatory animus behind the fact that we were going to increase Mr. Ortiz's workload. That decision was made in 2007, and that discrete act at that point in time, that's when the claim and the cause of action accrues, and that 300-day statute of limitations period begins to run. Referring to the Supreme Court case Delaware State College v. Ricks, the quote is that the proper focus is on the time of the discriminatory act, not upon which the consequences of the act become most painful. Mr. Ortiz was fully aware at the time that that add-on was added, according to his own affidavit, is when he was working feverishly and he needed to do more. Back in 2007 is when it started? 2007, correct. And so the 300-day window would start to run from that point in time, as opposed to allowing a plaintiff to bootstrap an inequitable job assignment argument from some time in the past until the ultimate and eventual termination, causing the employer at that point in time to try to defend decisions and things that were made well in the past when those types of statute of limitations issues occurred. So the only timely claim here is one relating to the termination? It is the one related to the termination, yes, Your Honor, and that is why there is the legitimate nondiscriminatory reason, the multiple quality control violations on top of the last chance agreement, which gave rise to the reasons for terminating Mr. Ortiz's employment. Essentially, there was contamination. These are products that are going out into the public. These are things that are being placed on store shelves. Hershey takes this very seriously and needs to make sure that these are pure, quality products that are going out into the market. As it relates to the last chance agreement... I'll be inspecting my next Hershey's Kiss from the flecks of plastic. I make no comment, Your Honor. As it relates to the last chance agreement, it bears noting that the basis and the reasoning behind that last chance agreement was because Mr. Ortiz had made a verbal threat to another co-worker, which that co-worker reported. Mr. Ortiz certainly may have a different version of events, but it's undisputed that Mr. Ortiz is the only individual who made a verbal threat to anybody. The only factual dispute may be, well, was the elbow accidental or was the elbow intentional as somebody was trying to make their way behind him in the packaging department when Mr. Ortiz was speaking with his wife, who was an employee of the packaging department. But the ultimate issue becomes the verbal threat of violence that was made by Mr. Ortiz to the other employee. The threat itself was undisputed. The threat itself was undisputed. You're correct. It's that it might hit you in the face, is what Mr. Ortiz told the other employee. And, again, under the zero-tolerance violence policy at the plant, any threat of violence is subject to immediate termination. But, again, it was decided that there would only be a brief unpaid suspension that was issued to Mr. Ortiz when he came back. He was issued that last chance agreement. The last chance agreement said any further policy violation would be grounds for immediate termination. Notwithstanding that fact, he received five other policy violations from the time of the last chance agreement until the end of his employment. These last chance agreements, or citations, or whatever you call them, would that be in effect for the rest of his work time with Hershey? I believe there was no expiration on the last chance agreement. But, however, of course, as you move further out, it would be somewhat unreasonable for an employer to then rely back on that last chance agreement. Here, what had happened was the last chance agreement was issued in 2008, and quality control violations occurred shortly thereafter in time. We're talking two in 2009, one in 2010, and then the two that gave rise to his termination occurring towards the end of there in 2010 with the metal contamination and the plastic contamination violation. Ultimately, however, again, beyond the fact that Mr. Ortiz is Hispanic American, there's no evidence to show that anything as it relates to his employment was taken because he is Hispanic American. There was a Hispanic American employee working on the first shift with him on the A-line who did not have that add-on. There's no evidence of the record to show that his son, who was working the D-line on the second shift, was issued any type of discipline whatsoever for any type of quality control violation or anything like that in that matter. There's also evidence of record to show that the first shift supervisor issued discipline in accordance, essentially, as it broke down with the demographic breakdown of the facility itself where there was 80-some percent African American employees, 6 percent Caucasian, and then 15 to 17 percent Hispanic American employees. That's where the discipline fell, essentially along racial lines, clearly not showing that there was any bias one way or the other towards any particular racial group. In closing, it's the undisputed fact that remains that Ortiz has failed to point to another press operator outside his protected class who was on a last-chance agreement and who had a comparable record of quality control violations but was also not terminated. Although Mr. Ortiz believes that he was assigned a greater workload, which, according to him, resulted in his eventual termination, there is simply no basis in the record or the law to conclude that Hershey's conduct was in any way unlawful or motivated by Mr. Ortiz's race. Whether in the context of a prima facie case or under pretext, Mr. Ortiz's allegations of race discrimination fail as a matter of law and the lower court's decision granting summary judgment should be upheld. Thank you. Very well. Thank you for your argument. We'll hear from Ms. Garner in rebuttal. I would like to hear your argument again. I know you briefed as to why the double work claim is not time-barred because the statute requires him to bring to the EEOC within 300 days a complaint about this unlawful practice and nothing happens for three years. The double workload is not time-barred in this instance because Mr. Ortiz is asserting that the termination is the adverse employment action. Is that the only adverse employment action you're arguing in front of our court? Yes. No, I'm arguing the inequitable distribution of assignment because but for the inequitable distribution of assignment, Mr. Ortiz would not have been terminated for the quality check. I mean, that is not an argument that the inequitable assignment itself is a Title VII violation. Your Honor. I mean, just to clarify sort of what we need to address here. Yes, sir. Is it fair to say that you do not have a stand-alone inequitable treatment claim? I don't. Because it's time-barred. I think that that is fair to say. However, I do think that because the court can look at background information to determine whether or not there is discrimination in a result, the court can consider that. The court can consider the inequitable distribution of job assignment and how it impacted the termination. The court can certainly consider that under the law. He did the job with the add-on for three years. He tried to do the job. When he asked for help, help was provided to him within that period, 30 days or so before his termination. He would get help. They would take the help away. Once Mr. Ortiz was terminated, the add-on aspect of that job, D-line, was terminated as well. No other, the African-American, the relief African-American male, nor Ms. Garlot, the Caucasian female, no one else was required to perform those two jobs except Mr. Ortiz and, to a degree, his son on the second shift. There was an African-American male who? Who did not perform the add-on required. They weren't running the icebreaker's add-on during the third shift or whatever it was? He did not perform the icebreaker function of the D-line. There was no one, defendant could not put forth anyone who testified that they did the same job except Mr. Johnson did testify that when he acted in the position of relief worker, he did not and he could not perform that aspect of that D-line operator, as was required essentially without error from Mr. Ortiz. That wasn't required of any other press operator. Are you saying they stopped running this add-on line? Yes. Yes. And I would also, just to demonstrate to this court how the district court applied that standard, Sylvia Ortiz, the wife of Jesse Ortiz, she gave an affidavit because of this, and this relates to the LCA and the Hershey's zero tolerance regarding workplace violence. And Ms. Ortiz related an incident where Ms. Granberry observed two women fighting on the line, which caused the line to be shut down for 45 minutes. And Ms. Ortiz in her affidavit stated that she didn't receive a write-up for that. Well, the district court looked at that, and even though there was all of these everments regarding Ms. Granberry, Ms. Granberry, but she didn't say these women were also, but it was a global, so to speak, restriction. And the district court said, well, she didn't say that they were supervised by Ms. Granberry, so I'm not going to consider that evidence. All right. Well, all right. No, that's very good. Very helpful arguments. Appreciate them. Thank you. The case will be submitted. Thank you. Thank you. The clerk may call the next case.